IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 10, 2021

**STATE OF TENNESSEE v. DEMETRIE DARNELL OWENS**

**Appeal from the Circuit Court for Marshall County**
**No. 16-CR-142     Forest A. Durard, Jr., Judge**

_____

**No. M2020-00132-CCA-R3-CD**

_____

The Defendant, Demetrie Darnell Owens, was convicted by a Marshall County Circuit Court jury of two counts of simple possession of cocaine, Class A misdemeanors; possession of cocaine within 1000 feet of a school or park with intent to sell, a Class B felony; attempted possession of cocaine with intent to deliver, a Class C felony; two counts of simple possession of Xanax, Class A misdemeanors; two counts of simple possession of methamphetamine, Class A misdemeanors; simple possession of marijuana, a Class A misdemeanor; and simple possession of Suboxone, a Class A misdemeanor. He was sentenced to an effective term of twenty years in the Department of Correction. On appeal, the Defendant argues that: (1) the trial court erred in allowing a State's witness to testify concerning statements and text messages made by an unavailable witness; (2) the State committed prosecutorial misconduct during closing argument; (3) the trial court's instruction that two individuals were accomplices as a matter of law amounted to a comment on the proof; and (4) the evidence is insufficient to sustain his convictions. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3, Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT W. WEDEMEYER, J., joined.

Demetrie Darnell Owens, Hartsville, Tennessee, Pro Se (on appeal), John Schweri, Columbia, Tennessee (for post-trial matters), and Mitchell Ferguson, Murfreesboro, Tennessee (at trial), for the appellant, Demetrie Darnell Owens.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Robert J. Carter, District Attorney General; and Andrew Wright and William Bottoms, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

# FACTS

The Defendant was charged in an eleven-count indictment with possession of cocaine base within 1000 feet of a school or park with intent to sell and deliver (counts one and two), possession of cocaine within 1000 feet of a school or park with intent to sell and deliver (counts three and four), possession of Xanax within 1000 feet of a school or park with intent to sell and deliver (counts five and six), possession of methamphetamine within 1000 feet of a school or park with intent to sell and deliver (counts seven and eight), possession of marijuana and Suboxone within 1000 feet of a school or park (counts nine and ten), and evading arrest (count eleven). The trial court granted judgment of acquittal on the evading arrest charge at the close of the State's proof. We summarize the proof from the trial as follows.

## State's Proof

Agent Steven Daugherty with the 17th Judicial Drug Task Force testified that on January 5, 2016, he was informed by the assistant director of the task force, Tim Miller, that a potential drug transaction was going to take place in the Jones Park area. Assistant Director Miller described to Agent Daugherty that the suspect, nicknamed "MeMe," would have dread locks and be wearing a brown hoodie. Assistant Director Miller also told him that the suspect would have cocaine, Xanax, and marijuana, and that he intended to distribute the drugs in the Jones Park area. Agent Daugherty noted that the Jones Park area was well-known for drug activity.

Agent Daugherty testified that he got to the park around 6:30 or 7:00 p.m. He recalled that it was a crisp and cold evening, but the sky was clear, and it was not raining. There were no vehicles in the area when he arrived, so he drove around the vicinity. He noted that the park was approximately 300 to 500 feet from the board of education building and 600 feet from a library. As Agent Daugherty was driving, he saw a white truck driving at a high rate of speed, which "logged . . . in [his] memory . . . [as] sort of odd."

Agent Daugherty parked his vehicle at the board of education building from where he could discretely observe the adjacent park. While he waited, he corresponded with another officer who provided him with a photo of "MeMe," who turned out to be the Defendant. About thirty minutes after setting up, Agent Daugherty saw a four-door silver Buick arrive and back into a parking space by the pavilion. A few minutes later, the same white truck Agent Daugherty had seen earlier arrived quickly, as if in a hurry. The truck

parked with the driver's side next to the driver's side of the Buick. A man with dread locks and dark clothing got out of the back, passenger's side of the Buick and got into the passenger's side of the truck. Based on the information that he had received and his observations, Agent Daugherty suspected that a drug deal was taking place.

Agent Daugherty testified that he called for a marked patrol unit to approach the area with him because he was in plain clothes and an unmarked vehicle. He pulled up next to the passenger side of the truck and exited his vehicle. As Agent Daugherty walked over to the truck, an individual with dread locks and wearing a brown hoodie who matched the photo of the Defendant got out of the truck. The Defendant made eye contact with Agent Daugherty, and Agent Daugherty intuitively knew the Defendant was about to run. Agent Daugherty said, "police, stop," but the Defendant turned and ran off.

Agent Daugherty testified that he chased the Defendant, who had a hard time running because his pants kept falling down. He saw a white cellphone fall out of the Defendant's pocket and onto the ground as they were running. The Defendant ran near a funeral home and turned right around a hedgerow, which prompted Agent Daugherty to slow down to keep from running into a possible ambush. Agent Daugherty continued to follow along, catching glimpses of the Defendant from time to time, until he came upon the Defendant lying face down on the ground with his arms out. Just outside the reach of the Defendant's hand was $40 that was "rolled up."

Agent Daugherty walked the Defendant back to the patrol unit, retracing the Defendant's steps. He explained that the night was "frosty," and the frost had preserved the Defendant's path. There were no other people in the area, as it was "just one of those cold, bitterly cold nights to where everybody has already gone in the house and staying out of the cold." Just outside the footpath, Agent Daugherty found a rolled-up dollar bill with a powder substance on it that he believed to be cocaine.

Agent Daugherty and another officer continued to search the area, thinking that the Defendant had quickly discarded drugs during the chase. After checking all along the ground, they decided to check a patio area that served as the roof of the funeral home. Agent Daugherty gave the other officer, Officer Lonnie Cook, a boost onto the patio, and Officer Cook found a plastic bag that contained twenty grams of cocaine, nine grams of a rock-like substance of cocaine base, two grams of marijuana, some methamphetamine, some Suboxone strips, and nineteen Xanax pills. A pocketknife was also found near the bag. Agent Daugherty reiterated that the night was frosty, and there was frost on everything outside except the cellphone, the rolled-up dollar bill, the $40, the plastic bag containing drugs, and the pocketknife.

Agent Daugherty recalled that other officers transported the Defendant to the police station, while he went back to where the silver Buick and white truck were parked. Bobby Coggin was identified as the man in the white truck, and LaKeshia Randle and Kashus Randle were the women in the silver Buick. The women informed Agent Daugherty that they brought the Defendant to the area so they could smoke marijuana and had no knowledge of anything else that was transpiring.

Agent Daugherty spoke with the Defendant, who, after being Mirandized, said that the recovered drugs did not belong to him. Agent Daugherty also asked the Defendant about $1,783 that was found in his sock, and the Defendant told him that "he didn't have a job but that he received that cash from his mother." Later, however, when Agent Daugherty was reading off an inventory list of everything that was recovered including the kinds and amounts of drugs, the Defendant made an acknowledgment that appeared as if he was agreeing that the list was correct.

On cross-examination, Agent Daugherty recalled that he learned of the impending drug deal from Assistant Director Miller, who had received the information from one of his confidential informants. Assistant Director Miller instructed him to watch the pavilion area at the park. Once at the park, Agent Daugherty received more information over the phone, specifically that the suspect would have dread locks and be wearing a brown hoodie. Agent Daugherty acknowledged that the vehicle he was in was unmarked with no emergency equipment and he was in plain clothes, but said that he identified himself as police. He said that at the point he yelled, "stop, police," he wanted to detain the Defendant based on reasonable suspicion that a drug deal occurred and explained in detail the basis for his reasonable suspicion. However, Agent Daugherty agreed that the evading arrest charge stemmed from the Defendant's running from him. Agent Daugherty said that he did not know what led to the Defendant's lying on the ground, which allowed him to catch up.

Agent Daugherty agreed that he did not find any drugs on the Defendant's person when searched at the scene. He acknowledged that he sent the rolled-up dollar bill with a white powdery substance on it to the lab for testing, but he did not receive the results. He said that he did not have the lab test any of the recovered items for fingerprints because he was told by another officer that it was unlikely that any would be found. Agent Daugherty agreed that someone could have been on the patio of the funeral home earlier in the day, but said there was no one there at the time these events took place. Agent Daugherty recalled that Mr. Coggin, the driver of the white truck, was under the influence and very belligerent when he was taken into custody and did not provide any information.

On redirect, Agent Daugherty reiterated that he saw no activity in the area during the thirty minutes to an hour before the suspected drug deal aside from when he saw the white truck speeding near the board of education building.

Officer Shaun Crawford with the Lewisburg Police Department testified that he was in communication with Agent Daugherty and other officers the evening in question. Officer Crawford looked into information about an individual who went by the street name, "MeMe," and determined it was the Defendant and provided Agent Daugherty with a picture of him. While they were on the phone, Agent Daugherty told Officer Crawford that he saw a suspect matching the description getting into a white truck and asked Officer Crawford to come to the location as backup. As he was pulling up, Officer Crawford saw a person matching the description exit the truck and take off running. Agent Daugherty chased after the individual, while Officer Crawford secured the people in the two vehicles.

On cross-examination, Officer Crawford testified that Jones Park was known for drug activity. Officer Crawford stated that he did not participate in the search of the area around where the Defendant ran. On redirect, Officer Crawford said that the area around the funeral home was not a "high drug trafficking area."

Officer Lonnie Cook with the Lewisburg Police Department testified that he was on routine patrol when he heard of Agent Daugherty's pursuit of a suspect over the police radio. Officer Cook responded to the scene and assisted Agent Daugherty in searching the area for drugs he believed the suspect had discarded. Agent Daugherty assisted Officer Cook in climbing up to a porch that was above the garage of the funeral home, and Officer Cook found a bag of drugs there. He noted that the plastic bag of drugs and a knife located nearby were dry, while everything outside was frosty or wet.

On cross-examination, Officer Cook said that he had never personally made a drug bust at Jones Park. With regard to the bag of drugs, Officer Cook said that his opinion was that the package had not been there long because it was dry, and everything else outside was frosty or wet. Officer Cook admitted that he never saw the Defendant with the bag of drugs.

Bobby Coggin testified that he was intoxicated and driving through Jones Park in his truck on the night in question when a vehicle flashed its lights at him. He did not know who was in the vehicle, but he stopped. There was one man and two women in the car. The only distinguishing characteristic he recalled about the man was that he was African-American. Mr. Coggin said that he "hollered out and asked them about a forty," explaining he wanted to get some cocaine. The man got out of the back seat of the car and got into Mr. Coggin's truck. Mr. Coggin could not identify the man in court, as he did not know him and only saw him that one time. Mr. Coggin said that they were unable to complete

the drug exchange because "[t]he police rolled up on us[,] and "[t]he other guy got out and took off[.]"

John Scott, an analyst with the Tennessee Bureau of Investigation ("TBI") Crime Laboratory, testified that he analyzed the substances that were recovered from the patio of the funeral home and determined them to be 2.36 grams of marijuana, 21.62 grams of powder cocaine, .39 grams of methamphetamine, 8.48 grams of crack cocaine, a package of Suboxone, and 20 white tablets.

On cross-examination, Mr. Scott agreed that officers sometimes requested DNA or fingerprint testing of the package containing the evidence submitted for testing and that such could have been done in this case. Mr. Scott said that the white pills and sealed package of Suboxone were not tested due to laboratory backlog at the TBI. Mr. Scott acknowledged that there was no proof of ownership on any of the evidence submitted.

**Jury-Out Discussion Regarding Kashus Randall**

The court conducted a jury-out discussion regarding witness Kashus Randall, who had been subpoenaed but failed to appear to testify. The State informed the court that Ms. Randall was in the Buick with the Defendant and another woman, and she overheard some conversations between the Defendant and Mr. Coggin, the driver of the truck. Agent Daugherty recounted his conversation with Ms. Randall that took place after he advised her of her Miranda rights. He said that Ms. Randall never mentioned drugs or narcotics but that she heard Mr. Coggin ask the Defendant for a "twenty" and, after some haggling, they settled on a "forty," and the Defendant walked over to Mr. Coggin's truck. Ms. Randall did not know what the terms meant, but Agent Daugherty surmised based on his past experiences that the two men were discussing "dollars worth of whatever narcotics[.]"

Agent Daugherty recalled that he asked Ms. Randall why she was with the Defendant that night, and Ms. Randall said to get marijuana from the Defendant and smoke with him. Ms. Randall allowed Agent Daugherty to look at text messages on her phone between her and the Defendant, who was listed as "petty ass" in her phone, which discussed Ms. Randall's desire to obtain marijuana from the Defendant. Agent Daugherty took a photograph of the text messages. He said that there were older messages that "allud[ed] to narcotics type traffic."

On cross-examination, Agent Daugherty testified that he executed a search warrant of the phone that fell out of the Defendant's pocket during the foot chase and determined that the phone number for it was the same as the number in Ms. Randall's text messages for "petty ass." Asked if the phone could have belonged to someone else, Agent Daugherty responded, "I really doubt it, being the last message was at 6:55[,] and the event happened

at 7:10 or around 7:10." However, Agent Daugherty acknowledged that he did not personally see the Defendant type the text messages or discover who was financially responsible for the cellphone. Agent Daugherty testified that it was common knowledge among law enforcement that "weed is marijuana and a dime is a quantity." On redirect, Agent Daugherty confirmed that Ms. Randall told him that the individual she had in her phone as "petty ass" was the Defendant and that they went to the park together.

There was a prior agreement between the parties that the State would not introduce the contents of the Defendant's cellphone in its case in chief. The State entered the agreement because a copy of the search warrant for the Defendant's phone could not be located but was, however, located prior to trial. The State asserted that now that Ms. Randall had made herself unavailable to testify, the contents of the Defendant's phone could be used to authenticate the text messages found on Ms. Randall's phone.

The State asserted that Ms. Randall's statements and text messages were admissions against interest of an unavailable witness. The Defendant argued that the admission of the evidence violated his right to confrontation.

The court revisited the issue later during trial. The court first excluded anything Ms. Randall heard Mr. Coggin say. All the parties then agreed that Ms. Randall's statement that she wanted to smoke marijuana would be an illegal activity "because obviously one would have to possess the pot to smoke it." The court allowed proof that Ms. Randall "stated that she wanted to smoke some pot and that she wanted to get some pot." However, the court did not allow any proof that inculpated the Defendant "without the Defendant having any ability to co[n]front the Declar[a]nt about a statement that inculpates him." Nevertheless, the Defendant objected to the "autopsy on the witness' statement line by line as to what [he] might be able to co[n]front the witness on or what [he] might not be able to co[n]front the witness on[.]"

As to the text messages, the court was satisfied with the authenticity of the messages in that they came from the phone the Defendant dropped during the foot chase and that phone had the same text messages as Ms. Randall's phone. However, the court noted that it should "narrowly construe[]" admissibility of the messages and excluded two of the exhibits, 22(a) and 22(b). The court allowed one exhibit, 22(c), that detailed Ms. Randall's requests for marijuana but redacted the Defendant's responses. The court informed the Defendant that he could request a limiting instruction in front of the jury. The court reiterated that "I can't be allowing [Ms. Randall] to make inculpatory statements about [the Defendant], and there's no availability to cross-examine her by the Defendant." The court allowed testimony that the phone number that exchanged text messages with Ms. Randall was the phone number of the cellphone dropped by the Defendant during the foot chase.

**Jury-In Testimony**

Back in the presence of the jury, Agent Daugherty testified that he interviewed Kashus Randall at the scene on the night in question, and she was subpoenaed to testify at trial but failed to appear. Ms. Randall told Agent Daugherty that she was at that location because she wanted to smoke marijuana.

Ms. Randall allowed Agent Daugherty to look at her cellphone. She showed him a phone number and nickname for the individual with that phone number, as well as the text messages between her and that individual. Ms. Randall identified the nickname of "petty ass" in her phone as being the Defendant. Agent Daugherty took photos of the screen of Ms. Randall's phone.

The messages sent by Ms. Randall were time-stamped from 6:43 p.m. to 6:55 p.m. on January 5, 2016. The first message sent by Ms. Randall stated, "W.Y.A." The next message she sent said, "Gan, I wanted to match petty ass[,]' which Agent Daugherty did not understand what that meant. The next message stated, "you got some weed," and then the final message was "I need a dime." The phone number that the messages were sent to was the same as the number for the phone that fell out of the Defendant's pocket during the foot chase.

On cross-examination, Agent Daugherty agreed that he first saw the silver Buick in the park "around 7:00-ish" that evening and that the last text message was sent at 6:55 p.m., which meant that "five minutes before you saw them, [the Defendant] is texting somebody that's in the front seat" of the car he was in. Agent Daugherty acknowledged that he had never heard the Defendant referred to by the nickname of "petty ass[.]"

On redirect, Agent Daugherty said that his time estimate could be off by a few minutes and that he could have first seen the Buick at 7:10 p.m. He agreed that it could be possible that Ms. Randall sent the text messages and then picked up the Defendant.

On re-cross examination, Agent Daugherty acknowledged that he testified at the preliminary hearing that he arrived in the area between 6:30 and 7:00 p.m.

On further redirect, Agent Daugherty said that his report, which indicated an action time of 7:10 p.m., could have been based on "when I found narcotics or when [the Defendant] ran depending on what stamp I used as an approximate there."

Following the conclusion of the proof, the jury convicted the Defendant of the lesser-included offenses of simple possession of cocaine in counts one and two; possession of cocaine within 1000 feet of a school or park with intent to sell as charged in count three;

the lesser-included offense of attempted possession of cocaine with intent to deliver in count four; the lesser-included offenses of simple possession of Xanax in counts five and six; the lesser-included offenses of simple possession of methamphetamine in counts seven and eight; and the lesser-included offenses of simple possession of marijuana and Suboxone, respectively, in counts nine and ten.

We glean from the record that trial counsel failed to file a timely motion for new trial, which resulted in the trial court only considering the sufficiency of the convicting evidence. Counsel did not file a notice of appeal, and "the Defendant was, unbeknown to the court, largely abandoned by trial counsel." A motion by the Defendant for a late-filed appeal was denied. The Defendant then filed a petition for post-conviction relief, alleging among other things that counsel was ineffective regarding the motion for new trial. The trial court granted the Defendant a delayed appeal, which included a hearing on issues "which could have been properly included in a motion for new trial had it been filed timely." The trial court denied the motion for new trial following the hearing, and notice of appeal was filed by counsel. After various motions and a hearing, the Defendant was granted permission to proceed pro se in this appeal.

## ANALYSIS

### I. Statements by Unavailable Witness

The Defendant first argues that the trial court erred in allowing Agent Daugherty to testify regarding statements and text messages made by Ms. Randall because it constituted hearsay and violated his right to confrontation.

As detailed above, the trial court conducted a hearing to determine the admissibility of statements and text messages made by Ms. Randall after she was deemed unavailable for having been subpoenaed and failing to appear for trial. The court allowed proof that Ms. Randall "stated [to Agent Daugherty] that she wanted to smoke some pot and that she wanted to get some pot," but the court did not allow any proof that inculpated the Defendant. The court allowed the introduction of text messages that detailed Ms. Randall's requests for marijuana but redacted the Defendant's responses.

The admission of evidence generally lies within the sound discretion of the trial court and will not be reversed on appeal absent a showing of an abuse of discretion. See State v. McCoy, 459 S.W.3d 1, 8 (Tenn. 2014). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining. State v. Herron, 461 S.W.3d 890, 904 (Tenn. 2015).

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible at trial unless it falls under one of the exceptions to the rule against hearsay. Tenn. R. Evid. 802. Tennessee Rule of Evidence 804 governs the hearsay exception regarding unavailable witnesses. Relevant here, the rule provides that a statement which, at the time of its making, so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless believing it to be true, is admissible if the declarant is unavailable as a witness. Tenn. R. Evid. 804(b)(3). A declarant is unavailable when, *inter alia*, the declarant is "absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance by process[.]" Tenn. R. Evid. 804(a)(5).

Here, Ms. Randall's statements and text messages clearly subjected her to criminal liability and, therefore, the trial court did not abuse its discretion in allowing their admission as statements against interest.

As to the confrontation issue, the Sixth Amendment of the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. The Tennessee Constitution provides the corresponding right "to meet witnesses face to face." Tenn. Const. art. I, § 9. In order to protect a defendant's right to confrontation, before the prior testimony of a witness will be admitted, the State must show that (1) the witness is unavailable and (2) the defendant had a prior opportunity to cross-examine the witness. Crawford, 541 U.S. at 68. Hearsay is testimonial where it takes the form of "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact" and includes statements "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 51-52.

We first observe that Ms. Randall's text messages, part of an exchange with an acquaintance prior to being interviewed by the police, did not qualify as testimonial. Therefore, there is no confrontation clause issue in their regard. See State v. Alex Goodwin and Joey Lee aka Joey Currie, No. W2015-00813-CCA-R3-CD(C), 2017 WL 2472371, at *15 (Tenn. Crim. App. June 7, 2017), perm. app. denied (Tenn. Oct. 6, 2017) (holding that "[n]othing about the text messages indicate they were 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'").

Turning to Ms. Randall's verbal statements to Agent Daugherty, we note that Agent Daugherty was only allowed to testify concerning statements Ms. Randall made against

- 10 -

her interest and not include any reference to the Defendant. The court specifically ruled that it would not allow any proof that inculpated the Defendant "without the Defendant having any ability to co[n]front the Declar[a]nt about a statement that inculpates him." We conclude that the Defendant's right to confrontation was not violated.

## II. Prosecutorial Misconduct

The Defendant next contends that the prosecutor's "intentional" misstatement during closing argument that a rolled-up one-dollar bill had cocaine residue on it amounted to plain error.

The record shows that during the State's initial closing argument, the prosecutor recounted Agent Daugherty's foot chase of the Defendant and stated, "[H]e comes on around, he does find the Defendant laying down there, and then he starts retracing those steps. The phone, the one-dollar bill with cocaine residue on it, and again those forty dollars laying there[.]" No objection was raised at trial, but the issue was presented in the motion for new trial. At the motion for new trial, the trial court held that "[t]here was not a foundation laid to allow the agent to give that opinion[,] and he likely could not have established one; however, this rather small fact was harmless given the amount of substances which were actually tested and demonstrated to be cocaine." The court applied the same ruling to the Defendant's claim regarding the State's reference to the dollar bill having cocaine residue on it.

To be entitled to relief under the doctrine of plain error, the Defendant has the burden to establish the presence of the following five factors: (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the issue was not waived for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. State v. Vance, 596 S.W.3d 229, 254 (Tenn. 2020) (citations omitted). "'Moreover, the error must have been of 'sufficient magnitude that it probably changed the outcome of the trial.'" Id. (quoting State v. Banks, 271 S.W.3d 90, 119 (Tenn. 2008)).

Upon review, we determine that no substantial right of the accused has been adversely affected and that consideration of the error is not necessary to do substantial justice. The State's case linking the Defendant to the drugs was substantial and the misstatement was very minor; therefore, we conclude that the misstatement of evidence by the State did not amount to plain error.

## III. Accomplice Instruction

- 11 -

The Defendant argues that the trial court erred in charging the jury that Kashus Randall and Bobby Coggin were accomplices as a matter of law because such amounted to a comment on the proof.[1]

During discussion about the jury charge at trial, the Defendant objected to the court giving an accomplice instruction, asserting that "they weren't a part of any plan or scheme." The court observed that an accomplice was someone who "could be charged with participation in the activity[,]" and that the instruction would seemingly be a benefit to the Defendant "because it makes [the jury] look at those two individuals, their testimony perhaps in greater depth than it might be with every witness."

In Tennessee, judges are constitutionally prohibited from commenting upon the credibility of witnesses or the evidence in a case. See Tenn. Const. art. VI, § 9 (providing that "judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law"); State v. Suttles, 767 S.W.2d 403, 407 (Tenn. 1989) ("In all cases the trial judge must be very careful not to give the jury any impression as to his feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury."). We cannot agree with the Defendant's contention that the trial court's charging the jury that Kashus Randall and Bobby Coggin were accomplices as a matter of law amounted to a comment on the proof. It is clear that the court was simply "declaring the law."

In the same vein, the Defendant seemingly claims that the trial court should have only given a simple accomplice charge and left it for the jury to determine whether the two individuals were accomplices.

"It is well settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Dorantes, 331 S.W.3d 370, 390 (Tenn. 2011); see also State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citing State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). "Whether jury instructions are sufficient is a question of law appellate courts review de novo with no presumption of correctness." State v. Clark, 425 S.W.3d 268, 295 (Tenn. 2014).

---

[1] We note that, interestingly, the Defendant asserts in his argument regarding sufficiency in the section that follows that he was convicted based on the uncorroborated testimony of "accomplices."

- 12 -

"An accomplice is defined as a person who knowingly, voluntarily and with common intent unites with the principal offender in the commission of the crime." State v. Anderson, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997) (citing State v. Perkinson, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992)). "When the facts concerning a witness's participation are clear and undisputed, the trial court determines as a matter of law whether the witness is an accomplice." State v. Robinson, 146 S.W.3d 469, 489 (Tenn. 2004) (citing Ripley v. State, 227 S.W.2d 26, 29 (1950); Perkinson, 867 S.W.2d at 7). When "the facts are disputed or susceptible to different inferences," however, the determination of whether the witness is an accomplice is a question for the jury. Robinson, 146 S.W.3d at 489 (citing Perkinson, 867 S.W.2d at 7); see also Conner v. State, 531 S.W.2d 119, 123 (Tenn. Crim. App. 1975). "The test generally applied is whether the witness could be indicted for the same offense charged against the defendant." Robinson, 146 S.W.3d at 489 (citing Monts v. State, 379 S.W.2d 34, 43 (1964)).

In ruling on this issue at the motion for new trial, the trial court found that even if it was error to give the instruction, "it would seem the [instruction] would weigh in favor of the Defendant since it required the witnesses['] testimony to be subjected to perhaps greater scrutiny than a non-accomplice." We agree with the trial court's assessment that even if it was error to charge the jury that Ms. Randall and Mr. Coggin were accomplices, such error was harmless. The Defendant's theory of defense was that the drugs were not his and could have been left by anyone. Ms. Randall and Mr. Coggin provided testimony that undermined that defense. The jury's being charged that those individuals were accomplices gave the Defendant the benefit of additional scrutiny of their testimony. If the jury had only been given a simple accomplice charge or no charge at all, it would have been able to consider their testimony without any corroboration. We conclude that if there was error in the trial court's instruction to the jury, such did not affect the verdict.

## IV. Sufficiency

The Defendant lastly raises several sub-issues under a challenge to the sufficiency of the convicting evidence.

When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence,

circumstantial evidence, or a combination of direct and circumstantial evidence.  State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence.  State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010).  It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence.  State v. James, 315 S.W.3d 440, 456 (Tenn. 2010).  In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence.  See Dorantes, 331 S.W.3d at 380-81 (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact.  See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).  Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient."  State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

### A.  Rolled-Up Dollar Bill

The Defendant contests the prosecutor's arguing during closing argument that the rolled-up dollar bill had cocaine residue on it.  This is essentially the same claim that is

addressed in Section II above. For the reasons previously stated, the Defendant is not entitled to relief on this issue.

## B. Authentication of Cellphone

The Defendant argues that the cellphone alleged to be his was not properly authenticated or proven to be owned by him. In ruling on this issue at the motion for new trial, the trial court found that the cellphone was sufficiently authenticated because the Defendant was in actual possession of the cellphone and messages on the cellphone matched those on Ms. Randall's phone.

Tennessee Rule of Evidence 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). Evidence may be authenticated through "[t]estimony that a matter is what it is claimed to be" or "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Tenn. R. Evid. 901(b)(1), (4).

Agent Daugherty testified that he saw the cellphone fall out of the Defendant's pocket during the foot chase and that the cellphone was dry whereas everything in the area was frosty or wet. Later extraction of data from the phone showed text conversations between that phone and the phone of Ms. Randall, thereby indicating use of the phone by the Defendant. The proof sufficiently established that the cellphone was in the possession of the Defendant. Moreover, the cellphone was not the linchpin of the State's case against the Defendant, and if there was any error in its admission, such did not affect the outcome of the trial.

## C. $40 Found at the Scene

The Defendant argues that there was insufficient proof connecting him to the $40 found at the scene. Bobby Coggin testified that he negotiated a $40 drug exchange with the Defendant, but the Defendant ran from the truck when Agent Daugherty approached. The evidence showed that the $40 was found on the ground just outside the reach of the Defendant's hand and was dry while everything around it was frosty or wet. This proof sufficiently connected the Defendant to the evidence and was properly admitted.

## D. Bag of Drugs

The Defendant argues that the bag of drugs recovered from the patio of the funeral home was not proven to have been possessed by him.

Tennessee Code Annotated section 39-17-417(a)(4) provides, in pertinent part, that it is an offense for a defendant to knowingly possess a controlled substance with intent to sell or deliver it. Possession may be constructive as well as actual. State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001); State v. Transou, 928 S.W.2d 949, 955-56 (Tenn. Crim. App. 1996); State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). "Constructive possession requires that a person knowingly have the power and the intention at a given time to exercise dominion and control over an object, either directly or through others. In essence, constructive possession is the ability to reduce an object to actual possession." State v. Copeland, 677 S.W.2d 471, 476 (Tenn. Crim. App. 1984) (citation omitted). An individual's mere presence in an area in which drugs are found, or association with another individual in possession of drugs, is not, alone, sufficient to establish constructive possession. Shaw, 37 S.W.3d at 903 (citing State v. Patterson, 966 S.W.2d 435, 445 (Tenn. Crim. App. 1997); Cooper, 736 S.W.2d at 129).

Mr. Coggin testified that he negotiated a drug deal with the Defendant to purchase cocaine. However, the Defendant fled when Agent Daugherty approached Mr. Coggin's truck. Agent Daugherty chased the Defendant and later found a bag of drugs just off the path of the chase. The bag of drugs was dry, while everything else in the area was frosty or wet, indicating that the bag had just recently been left. There were no other people in the area at the time. Given this proof, a rational trier of fact could find that the Defendant possessed the bag of drugs and then discarded them during the foot chase.

### E. Corroboration of Accomplice Testimony

The Defendant argues that the testimony of his accomplices, Ms. Randall and Mr. Coggin, was not sufficiently corroborated.

A criminal defendant in Tennessee cannot be convicted solely on the uncorroborated testimony of an accomplice. State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001) (citing State v. Stout, 46 S.W.3d 689, 696 (Tenn. 2001); State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); State v. Robinson, 971 S.W.2d 30, 42 (Tenn. Crim. App. 1997)). This principle has been described as follows:

> "[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the

requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration."

Bigbee, 885 S.W.2d at 803 (quoting State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)). Whether sufficient corroboration exists is for the jury to determine. Shaw, 37 S.W.3d at 903. The jury determines "the degree of evidence necessary to corroborate the testimony of an accomplice, and it is sufficient 'if there is some other evidence fairly tending to connect the defendant with the commission of the crime.'" State v. Anderson, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997) (quoting Clapp v. State, 30 S.W. 214, 217 (Tenn. 1895)).

Agent Daugherty testified that he saw the Defendant run from Mr. Coggin's truck and followed him for a short while before the Defendant gave up. Agent Daugherty retraced the path of the foot chase and, in the area, found the cellphone that he saw fall from the Defendant's pocket, $40, a rolled-up dollar bill, a pocketknife, and a bag containing drugs. Agent Daugherty testified the night was frosty and there was frost on everything outside except those items, indicating they had only recently been left. This was sufficient proof to corroborate the accomplices' testimony.

## F. Defendant's Confirmation of Drug Inventory

The Defendant lastly argues that it was error for Agent Daugherty to testify that after completing an inventory of the recovered drugs, he read the list to the Defendant, and the Defendant confirmed its accuracy. He asserts that he never claimed ownership of the drugs, but Agent Daugherty's testimony insinuated that he did.

Agent Daugherty testified that he spoke with the Defendant, after he was Mirandized, and the Defendant said that the recovered drugs did not belong to him. Later, however, Agent Daugherty read off an inventory list of everything that was recovered, including the kinds and amounts of drugs, and the Defendant made an acknowledgment that appeared as if he was agreeing that the list was correct.

The Defendant's confirmation amounted to a statement against interest and was admissible for the jury to consider. In Helton v. State, 547 S.W.2d 564, our supreme court addressed the difference between an admission and confession:

The distinction between an admission and a confession is blurred. Generally, however, a confession is a statement by the accused that he engaged in conduct which constitutes a crime. . . . An admission is an acknowledgement by the accused of certain facts which tend together with other facts, to establish his guilt; while a confession is an acknowledgement of guilt itself. An admission, then, is something less than a confession and, unlike a confession, putting to one side the problem of corroboration, an admission is not sufficient in itself to support a conviction.

Id. at 567 (citations and quotations omitted), overruled on other grounds by State v. Cabbage, 571 S.W.2d 832 (Tenn. 1978); see also State v. Litton, 161 S.W.3d 447, 457 (Tenn. Crim. App. 2004).

The Defendant's acknowledgment that Agent Daugherty's inventory of the bag of drugs was correct indicated that he possessed knowledge of the contents of the bag. This acknowledgment amounted to an admission which, along with other proof, could be considered by the jury to establish the Defendant's guilt.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE